FILED

11/09/2022

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2022

## STATE OF TENNESSEE v. JACQUIZ MCBEE

**Appeal from the Criminal Court for Knox County**
**No. 113585   Kyle A. Hixson, Criminal Court Judge**

_____

### No. E2021-01048-CCA-R3-CD

_____

Defendant, Jacquiz McBee, was convicted of first-degree premeditated murder and received a life sentence to be served consecutively to his prior three-year sentence for aggravated assault.  On appeal, Defendant argues: that the evidence was insufficient to support his conviction; that the trial court erred by excluding the victim and Defendant's minor child's statement to a forensic interviewer; that the trial court erred by failing to redact the words "on probation" from searches made on the internet from Defendant's cell phone; that the trial court erred by admitting the results of a Google search conducted by Detective McFarland consistent with a search made by Defendant; that the trial court erred by ordering consecutive sentencing; and that cumulative error entitles him to relief. Following our review of the entire record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JOHN W. CAMPBELL, SR., JJ., joined.

Mary Ward, Knoxville, Tennessee, for the appellant, Jacquiz McBee.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen and Joanie Stewart, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

This case arises from the shooting death of the victim, Jessica Davis, who was Defendant's ex-girlfriend and mother of his four-year-old son. Defendant claimed that the victim shot herself while they were wrestling for the gun. The Knox County Grand Jury indicted Defendant for premeditated first-degree murder.

*Trial*

Michael Mays, custodian of records for the Knox County Emergency Communications District 911, identified the recording of a 911 call and the computer-aided dispatch (CAD) report for the call that the communications center received on April 16, 2018, at 9:16 p.m. The recording of the call was played for the jury.

During the call, Defendant told the 911 operator ("operator") that his son's mother attempted to shoot him. Defendant sounded frantic and had some difficulty telling the operator his location. He said, "I'm scared! I'm scared!" Defendant then went to a neighbor's residence to determine his location. When the operator asked for his name, Defendant replied: "My name is Jacquiz." The operator asked if Defendant was injured, and he said, "No she tried to pull a gun out on me." After repeatedly asking Defendant for his location, the operator asked, "Is anybody else there?" Defendant said, "No, it's just me and my son." He also told the operator that his son was four years old. Defendant eventually gave the operator an address of "2639 Bakertown Road." After prodding by the operator, Defendant finally gave an apartment number of "704." The operator then asked, "Who pulled the gun on you?" Defendant replied:

> I had my son sitting on my lap, and she was kind of playing with it. I thought it was a BB gun. She was – kept - she kept pointing it at me. Just playing. She was hopping then – hopping, then all of a sudden, I heard a click and I – pow! I wrestled her to the ground and kicked the gun away from her. We was wrestling for the gun. She was on top of me. She ended up shooting – she pulled the trigger. It was pointing right at her. It was pointing right f - - king at her.

Defendant identified the woman who was shot as the victim, Jessica Davis. He told the operator, "She's shot! She's shot! I don't know where on her body, [be]cause I don't want to see her. I don't want to see." The operator then asked, "She shot herself?" Defendant replied, "Yes." He also said that the victim was in the kitchen in Apartment 704. The operator asked, "And she did this on purpose?" To which Defendant explained, "She was really aggressive! She was really aggressive! She had a gun in her hand. I didn't know – I didn't know – I thought it was a fake gun, [be]cause it's pink. It's a pink colored gun." Defendant then identified himself as Jacquiz McBee.

Defendant told the operator that the victim "was just talking, just talking, like, I don't know if she was drunk or what." He said that when he heard the gun "click," he moved his son away and then "kind of wrestled [the victim] to the ground with the gun. She ended up pulling the gun with the trigger while it was pointing towards her." Defendant then wailed, "Why did she have a gun? Why did she have a gun? Why?" Defendant continued wailing, and the 911 operator attempted to console Defendant and instructed him to stay on the line and watch for police to arrive. At one point, Defendant exclaimed, "Oh my God! I could have been killed! I could have been dead! She could have killed me! Oh my God!" Defendant continued wailing, and the operator attempted to calm him and console him.

At one point during the 911 call, a child's voice can be heard making reference to a gun. Defendant then replied, "She had a gun? How do you know she had a gun? She shouldn't have had a gun around you, Baby." Defendant continued to wail intermittently and then exclaimed, "What's she got a gun for?" He later said, "Why would she try to kill me?"

Waynesha Murphy testified that she and the victim were best friends, and they spoke "almost daily." She said that the victim would have been twenty-five years old at the time of trial. Ms. Murphy testified that the victim and Defendant began dating when the victim was in eighth grade. She said that she began to disapprove of the victim's relationship with Defendant approximately two years prior to the victim's death, and she expressed this to the victim. Ms. Murphy noted that she lived with victim and Defendant at one point. She said that the victim and Defendant "broke up" in 2017, and the victim had a relationship with Nicholas Smith at the time of the victim's death in 2018. Ms. Murphy thought that the victim and Mr. Smith had been dating for approximately eight months to one year at the time.

Ms. Murphy testified that Mr. Smith was older than the victim, and they had a good relationship. She said that the victim and Mr. Smith argued "[l]ike any normal couple," but "it was never abusive or physical." Ms. Murphy denied that Mr. Smith ever put a gun to the victim's head or that the victim feared or had reason to fear that someone would harm or kill her. She had never known the victim to possess a gun or express any reason to harm herself. Ms. Murphy testified that the victim and Defendant had a son, L.M.,[1] who was three or four years old at the time of the victim's death. The victim and L.M. lived at 2639 Bakertown Road, Apartment 704, and Ms. Murphy had been there many times. She noted that the victim and Mr. Smith mostly stayed at his house when they were together.

Ms. Murphy testified that the victim contacted her sometime between 3:00 and 4:00 p.m. on April 16, 2018, and "was a little nervous about seeing [Defendant]." Ms. Murphy

---

[1] Because it is the policy of this court to protect the identity of minors, this witness will be referenced by initials.

said that Defendant last saw L.M. in early March on the child's birthday, and he "came and seen [L.M.] for like five minutes and took his tablet and gave him two toy guns." On the day of the shooting, Ms. Murphy told the victim to let Defendant see L.M. and to "[j]ust relax, you know." She noted that the victim had custody of L.M. and did not like Defendant having the child around other women, including Defendant's current girlfriend, Leah, with whom the victim "had trouble." Ms. Murphy testified that the victim had been upset with comments that Defendant's girlfriends had made on social media "disrespecting" the victim as L.M.'s mother. She said that the victim had an issue with Leah posting pictures of herself with L.M. on social media. Ms. Murphy testified that although the victim had custody of L.M., Defendant "was going to try to put his self on child support." She said, "I honestly just think that he just wanted to paint a type of picture of himself because he wasn't financially providing for [L.M.]. Nicholas [Smith] was."

Ms. Murphy testified that the victim was a happy person, and Ms. Murphy had no reason to think the victim would take her own life. When she saw the victim on the day of the shooting, "[i]t was never anything about her hurting herself or anything physical or anything like that." Ms. Murphy testified that she arrived at the victim's apartment at approximately 5:30 to 6:00 p.m. that day. The victim cooked some ribs at Ms. Murphy's request, and the two drank Crown Royal. Ms. Murphy explained that she and the victim "only took like a shot or two," and Ms. Murphy left before Defendant arrived because she did not "get along with him and he was just coming to see his son." She planned to return later to get the food. Ms. Murphy testified that Defendant "was just going to come by, see [L.M.], give him back his tablet and just see him for a while." The victim was supposed to call Ms. Murphy when Defendant left to let her know when to return. Ms. Murphy testified that the victim would never have had a gun around L.M. and noted that the victim had thrown away the toy guns that Defendant bought L.M. for his birthday in March of 2018.

On cross-examination, Ms. Murphy testified that she thought the victim had two shots of Crown Royal with Coke. She said that the victim appeared to be sober when Ms. Murphy arrived. She was unaware that the victim's blood alcohol content was .16. Ms. Murphy testified that she left the victim's apartment after an hour because Defendant was coming over. She said that the victim and Defendant's girlfriend, Leah, did not like each other, and she was not aware that the victim had made a video threatening Leah. Ms. Murphy was aware that the victim had once texted Defendant that she was fearful of Mr. Smith. However, Ms. Murphy said that the victim was drunk and did something "stupid" when she sent the text and lied about the argument.

Nicholas Smith testified that he and the victim dated for approximately one and a half years, and he helped her with her problems and with L.M. He said that they loved each other, and he supported her both financially and emotionally. The victim also confided in him about certain things. Mr. Smith testified that there were no physical altercations between him and the victim, and he never possessed a gun around her. He also

said that he never held a gun to her head, and she did not own a gun. Mr. Murphy testified that the victim did not allow guns around L.M., including toy ones.

Mr. Smith testified that the victim was "easy going" but had some "drama" with one of Defendant's girlfriends. He said that the victim was a very positive person, and he never had any concerns that she would commit suicide. Mr. Smith testified that he and the victim provided for L.M. She received food stamps, and Mr. Smith provided the rest, such as clothing, underwear, and "[t]ooth brushes and stuff."

Mr. Smith testified that he had never met Defendant in person, but he was aware that Defendant was supposed to pick up L.M. on April 16, 2018. The victim had been with Mr. Smith earlier that day at his house, and he took her home after 4:00 p.m. to wait for Defendant. Mr. Smith testified that he had to meet a heating/cooling repair person, and he was going to return to the victim's apartment later because she planned to cook. Her friend later called and told him what had happened but not that the victim had died. Mr. Smith learned of the victim's death when he arrived at her apartment. Mr. Smith testified that he did not give a gun to the victim. He said that "she don't play with that gun stuff, especially not around her child." Mr. Smith further testified that the victim was "too scared to lose [L.M.] to something dumb like that. She ain't like guns at all around him."

On cross-examination, Mr. Smith testified that he was unaware that the victim was on anxiety medication. He said that his arguments with the victim never became physical, and he was not aware that she had texted Defendant one time and said that they had an argument. Mr. Smith testified that he did not have any drinks with the victim before her death.

Lieutenant Jason Lubenski of the Knox County Sheriff's Office ("KCSO") testified that shortly after 9:00 p.m. on April 16, 2018, he responded to a shooting on Bakertown Road. Other officers, including Deputies Parker Hall and Mike McClain, also responded. Lieutenant Lubenski testified that they initially went to Apartment 701 but were then directed to Apartment 704 by Defendant who was standing outside of the apartment and seemed upset and distraught.

Footage from Deputy McClain's body camera was played for the jury. As he approached the door to Apartment 704, a small child is seen briefly in the video as an officer is heard saying, "Well can you take her over there please?" Defendant then approaches with [L.M.] at his side and says, "Does she have a f - -king gun and she was trying to shoot." [L.M.] says, "My mommy dead." To which Defendant replies, "Shut up, [L.M.]. You don't know that." Deputy McClain tells Defendant, "Well, you probably don't want to have your – this conversation in front of everyone. Okay?" With [L.M.] still by his side, Defendant speaks into his cell phone and says, "Baby, I'm at J.C.'s house. J.C. was kind of aggressive. I don't know what's going on. I think she was probably drinking. She had a pink – she got a pink gun. Police are here. Maybe she shot herself." Deputy

McClain asks Defendant to "come over here for a minute" and then asks him what happened. Defendant says:

> I had my son sitting on my lap. She came on first. I – I thought it was a toy gun. It was a pink gun. Then I was – she was playing with it. She was – I was recording her. She was like real aggressive, talking crazy. I heard a click noise. I said, "What the hell you doing?" I jumped towards her with the gun – I jumped towards her. I tried to get the gun away from her. But she's – she's strong. She trying to f- -cking get me off of her. And all of a sudden the gun just went off. It just went off. But she had the gun in her hand.

Deputy McClain tells Defendant that one of the other officers will take [L.M.] to a patrol car and "turn some cartoon on for him." Defendant then says, "I've never seen this in my life." Deputy McClain replies, "Not many people have seen this in their life. Now, I understand that your upset, and that's completely understandable. Okay?" Defendant then exclaims, "Why she got a gun? Why she got a gun? She probably would have killed me!" Deputy McClain asks Defendant about his relationship with the victim and why he was at her apartment, and Defendant answers his questions. Deputy McClain then asks, "Was she just like showing you the gun?" Defendant replies:

> No, she just came upstairs with the gun and I seen the gun. And all of a sudden I heard a click noise. I said, 'Jessie, what the hell are you doing? And Jessie, like she – got up to jump towards her, 'cause I thought it was just a toy gun. And I jumped towards her and tried to get the gun away from her and she just f- -cking pulled the trigger.

Defendant then asks, "She's okay. Right?" Deputy McClain replies, I've not even been in the house." He offers to put Defendant in his patrol car where its warm because "it's forty degree out here" and explains that Defendant is not under arrest. Defendant tells Deputy McClain that he has a car and needs to call his mother. However, Deputy McClain explains that "with everything we got going on right now, I can't let you make any phone calls." Defendant offers Deputy McClain his phone and asks him to "at least tell my girlfriend what's going on?" Deputy McClain asks for information to contact Defendant's girlfriend, which Defendant provides. The body camera footage ends with Deputy McClain patting down Defendant and placing him in the patrol car.

Zachery Helton testified that he purchased a pink Cobra .380 caliber pistol in 2017 from Midsouth Pawn. He decided to sell the gun in the Spring of 2018 and met the buyer at the "Oak Ridge, Lenoir City exit." They were on the left-hand side of the "Love McDonald's gas station." Mr. Helton thought that he sold the gun for $200 in cash, but he did not remember the buyer's name. He said that the police in this case took his phone to

find the buyer's contact number. Mr. Helton thought that the contact number in his phone associated with "Black Cobra 200" belonged to the buyer.

Demarcus O'Neal identified the pink pistol found at the scene of the shooting and said, "I've seen it, yeah." He spoke with Detective Keith McFarland and other detectives about the gun in 2018. Mr. O'Neal said he saw the gun listed for sale on Armslist and purchased it for his girlfriend in March of 2018. He said that his girlfriend did not want the gun, so he decided to "get rid of it," and sold it "a couple of weeks after [he] purchased it." Mr. O'Neal identified Defendant from a "photo spread" in 2018 and at trial as the person who bought the gun from him.

Deputy Shaker Naser, a member of the Cyber Investigations Unit of the KCSO, performed a forensic analysis on Defendant's iPhone. He was able to view the web history for websites visited from the phone, and some deleted files were recovered. Detective Naser testified that the phone had web history that showed deleted entries for "Armslist, Knoxville Handgun Classified[.]"

Detective Keith McFarland of the KCSO, Major Crimes Unit, responded to the scene on Bakertown Road approximately thirty to forty-five minutes after the first patrol officer arrived. He said that as part of the investigation, gunshot residue kits were collected, fingerprints were lifted, and a DNA analysis was performed on the gun. The scene was also photographed and videoed, and a spent shell casing and a magazine clip were found near the victim's body. Detective McFarland testified that Defendant's DNA and fingerprints were taken to compare with that found on the gun, but those tests were negative. He was not surprised by the results and noted that Defendant admitted to touching the gun. Detective McFarland testified that an ATF trace on the gun came back to Mr. Helton, who was cooperative about who had purchased the gun. Through Mr. Helton's phone, Detective McFarland discovered that Mr. O'Neal purchased the gun from Mr. Helton.

Detective McFarland interviewed Defendant on the night of the shooting and advised him of his *Miranda* rights. Defendant went home after the shooting but was arrested several weeks later. Detective McFarland attended the victim's autopsy and spoke with the medical examiner.

Detective McFarland testified that Defendant gave consent for his cell phone to be searched, and Detective McFarland, with the assistance of the Cyber Investigations Unit, examined it. He also examined the victim's and Mr. Helton's phones. Mr. Helton's phone contained interactions between him and Mr. O'Neal. Mr. O'Neal was listed in Mr. Helton's phone as "Black Cobra 200." Mr. O'Neal was listed in Defendant's phone as "Tool Guy."

Detective McFarland identified the "timeline from [Defendant's] phone. Looks like from 4/16/2018." There were website searches on the phone for topics such as "What does you reap what you sow mean in the Bible"; "Man struggles for his life"; "Limits on self-defense"; and "Probation, stand your ground, peaceful journey." An "extraction report" of the phone indicated that internet searches had been made for items including "man struggles for life"; "reap what you sow biblical meaning"; "killing someone in self-defense while on probation"; and "is killing ever justified on probation." The "web history" taken from Defendant's phone showed Google searches on April 16, 2018, with titles such as "reap what you sow biblical meaning"; limits on self-defense"; and "probation, stand your ground, peaceful journey, etc."

Detective McFarland testified that the top three results for a Google search on "killing someone in self-defense while on probation" included an article from Learnaboutguns.com, entitled "Convicted Felon Faces Charges for Defending Self Against Violent Home Invader"; an article from Lawyers.com, entitled "Limits on Self-Defense"; and an article from Texasschlforum.com, entitled "Probation, stand your ground, peaceful journey . . .etc." Detective McFarland testified that the "cookies" report from Defendant's phone indicated that the articles were accessed on the phone.

A recording of Defendant's interview with Detective McFarland during the early morning hours of April 17, 2018, was admitted as an exhibit and played for the jury. Defendant told Detective McFarland that before the shooting, he was sitting on the couch in the living room with L.M. sitting on his lap, and the victim was walking back and forth and talking aggressively. Defendant claimed that he ignored the victim because he was there to spend time with L.M. He said that he and the victim "talked a little, but nothing – like trying to catch up on each other." Defendant told Detective McFarland that the victim walked back into the kitchen, and he heard L.M. say, "Look, Daddy. Mommy has a gun." Defendant described the weapon as a "pink .22," and he "thought it was a toy gun." He said that the victim pointed the gun, but she was smiling so he thought that she was "playing." Defendant told Detective McFarland that he heard the gun "click," and he pushed L.M. into the living room toward the door. He then approached the victim and pushed her back into the kitchen up against the wall. Defendant said that the victim "somehow pushed [him] away," and as he pushed back, "[t]hat's when [he] heard the gun go off."

Detective McFarland asked if the victim was employed, and Defendant said, "She's never worked a day in her life." When asked how she paid the bills, Defendant responded, "Well, I try to give her money for the rent and she got government assistance or something like that." He said that the victim had stopped him from seeing L.M. and taking him places. Defendant told Detective McFarland that "[s]he said the only way I could see [L.M.] is to place myself on child support." He said he and the victim broke up because she got intoxicated at a party and became violent as they were driving home causing Defendant to crash his car into another car and a dumpster. Defendant said that a witness to the crash

- 8 -

came and pulled the victim off of him. He noted that the victim "was real bad with alcohol." Defendant told Detective McFarland that as he was taking the victim home after the crash in his damaged vehicle, he had to pull over and calm the victim down. A police officer arrived and offered to drive her home.

At one point, during a pause in the interview, Defendant said, "She had no reason to use a gun. Nobody want[ed] to hurt her." Detective McFarland asked Defendant if the victim used drugs, and Defendant said, "[A]t one point she was smoking pot." He also said that she met Mr. Smith, who was "like forty years old," through a friend that sold drugs. Defendant told Detective McFarland that on one occasion the victim told him that Mr. Smith put a "gun to her head and threatened to kill her." However, he said that the victim stayed with Mr. Smith because he was "helping her, like, moneywise." Defendant told Detective McFarland that he once called the Department of Children's Services ("DCS") after the victim texted him for help. He said that he was worried because "this guy may be trying to hurt her again because it's not the first time, not the second time." Defendant also said that he called police and asked them to send someone to help the victim, but Defendant did not know where the victim and Mr. Smith lived, so the police could not do anything.[2]

Defendant asserted to Detective McFarland that he reported incidents involving the victim to police on multiple occasions. Detective McFarland testified that he attempted to locate police reports on the incidents, but he found "[o]nly one that he mentioned." He did not find any reports or calls for service for any incidents between the victim and Mr. Smith. Detective McFarland testified that "at some point during [his] investigation, [he] was alerted about the presence of a letter that had emanated from the Knox County Jail[.]" He said that the letter consisted of four pages handwritten in pencil, "[f]irst being addressed to Keenan and the second being addressed to Keenan and Keelan, the third to Leah and the fourth to Marcus." The return address for the letter reflected "Ryan Stansberry" at the detention facility at 5001 Maloneyville Road. Detective McFarland testified that he obtained handwriting samples for Defendant and sent the letter to the Tennessee Bureau of Investigation ("TBI") for analysis.

The letter, admitted at trial and addressed to "Keenan and Keelan," asked them

> to find somebody to act as a witness of hearing an argument or some
> wrestling for me! Who ever you find must act as they don't know
> me and must not be on my [Facebook].

---

[2] During the interview, Defendant told Detective McFarland that he was on probation. The interview continued, but the recording had no sound for the next twenty seconds during which Defendant apparently talked about the reason for being on probation.

Who ever must make it seem like they were walking by [the victim's] ap[artment] that night and heard a gun shot from the direction of her ap[artment] when they got a distance.

Witness need to say they remember walking by hearing a man screaming and saying "Please drop it [victim]. Please fu[- -]king drop it" and also heard her screaming "You, you, you." (repeatedly) over his voice.

Witness walked a distance away hearing a gun shot as they got in the car!!

Incident happened April 16 or 17th around 9ish in Nature Cove in Baker Town.

I had Tabitha in mine [sic] or Daniel Thomas. Tabitha may do if you talk to her. Tell her I asked if she could.

If you find someone tell Mama to contact my lawyer and tell her she know someone that may have heard something regarding my case.

Who ever just not let anyone trick them saying I know them.

She may also see if they will give a statement at trial. This will really help me.

Just in case Google map her ap[artment] in Nature Cove so they can prove they know the ap[artment] and why they were near.

They could say they bought something from "Letgo" from someone there.

I'm trusting y'all with this.

Defendant asked "Marcus" to reset his Gmail password "asap." He said, "I also need to know if the searches in the Google account can be edited. . . Soon as you can figure out a [password] give it to Keenan to edit search they fabricated in my phone . . .or you can edit them for me." Defendant also asked Keenan to "edit or delete certain searches made in April 16 or 17[.]" He instructed Keenan to "keep the search I need regarding a TN show" called "how to get away with murder."

On cross-examination, Detective McFarland testified that Defendant's DNA was not found on the magazine clip from the gun, and Defendant's fingerprints were not found

on the gun. He agreed that while gunshot residue was found on the victim's hands, none was found on Defendant's hands. Detective McFarland said that he did not notice any blood spatter on Defendant's clothing. He agreed that Defendant was not arrested until nearly three months after the victim's death.

Special Agent Russell Davis, a forensic scientist with the TBI, testified as an expert in the microanalysis of gunshot residue. He prepared a laboratory microanalysis report in this case. Special Agent Davis testified that gunshot residue results from gases, metals, and other materials that scatter from a weapon when its fired, which may collect on a person's skin and clothing. He explained that "a gun is designed to fire and push a . . . bullet down the barrel of the weapon. So, most of this material is going to go down range. However, the weapon is not gas tight." Special Agent Davis testified that with a semi-automatic weapon, such as the one used in this case, "[t]he action of the weapon is going to kick out that cartridge case and allow some of this material to escape in the immediate vicinity of the person and the person's hands."

When asked about the presence of gunshot residue on the victim's hands, Special Agent Davis responded, "It's been my experience that generally when someone has been shot at close range from any particular weapon, it is not unusual to find this material on the person's hands." Concerning the lack of gunshot residue on Defendant's hands, Special Agent Davis testified:

> [T]here's a couple of reasons why someone may not have residue on their hands. The science does not help us in this instance. The possibility is that the person was not around a weapon when it fired. The other possibility is this material has come off of the hands. It's trapped in the oils on our hands. Our hands regenerate this oil. Over time the material is going to come off.
>
> If you wash your hands, it takes the oil and the residue with it. If you're just doing things, the oils on your hands are going to slowly start coming off. So not finding gunshot residue doesn't tell me anything except that I didn't find gunshot primer residue.

The parties stipulated at trial that Special Agent Lucas Riley, a forensic scientist with the TBI, would have testified that no latent fingerprint ridge detail was found on the gun, magazine clip, cartridges or cartridge case recovered in this case. The parties further stipulated that Special Agent Greg Fort, also a forensic scientist with the TBI, would have testified that "he tested the known blood standard from [the victim] and the buccal swabs known standard from [Defendant] against the fingernail scrapings of [the victim] and pistol and magazine from the kitchen floor. With regard to that, the results, the DNA profile was not able to be obtained." Special Agent Fort would have also testified that there was a

mixture of DNA on the gun that was consistent with at least three individuals, including one male.

Finally, the parties stipulated that Special Agent Alex Broadhag would have testified at trial as an expert in firearms identification. He would have testified that he examined the gun, magazine clip, and the cartridge casing recovered from the scene as well as the bullet recovered from the victim's body. Special Agent Broadhag determined that the gun fired the bullet recovered from the victim's body, and it ejected the cartridge casing. "Additionally, . . .[Special] Agent Broadhag also created test patterns at 3, 6, 12 and 18 inches that were then forwarded to the Knox County Medical Examiner with this firearm."

Deputy Christy Williams of the KCSO testified that she was helping out in the mail department of the Knox County Jail in March of 2019. She identified a letter with Ryan Stansberry as the sender which was returned to the jail because it was undeliverable to the intended recipient. Deputy Williams testified that when jail personnel attempted to return the letter to Mr. Stansberry, he refused delivery. The letter was eventually forwarded to the District Attorney General's Office.

Corporal Frank Nauss of the KCSO, Corrections Division, testified that Deputy Williams brought the letter to him, and he opened it in an attempt to determine who sent it. He testified that at the time the letter was received, Defendant and Mr. Stansberry were housed in the same "pod" of cells with one cell in between the two. Corporal Nauss testified that Defendant referred to himself in the letter. The letter was turned over to investigators.

Deputy Travis Oldham, a shift commander at the Knox County Jail, testified that he searched Defendant's cell in October of 2020 and discovered a handwritten list of names and phone numbers which Deputy Oldham scanned to his email. He noted that Defendant had no cellmate at the time. Approximately one week later, Deputy Oldham asked Defendant for the original copy of the list. He testified, "At first he was going to hand it over, and then he thought it, it was fishy[.]" Deputy Oldham testified that Defendant said, "'Let me call my attorney first. This doesn't seem right,' something in that regard." He then told Defendant, "It's not, it's not a legal piece of paper. There's no need to call your attorney." Deputy Oldham testified that Defendant said, "If you guys want this, you're going to have to retrieve it from the toilet," and Defendant flushed the list before Deputy Oldham could get into the cell.

Ryan Stansberry testified that he was incarcerated in the Knox County Jail in March of 2019, and he recalled being housed near Defendant "at some point." He said that they talked every day. Mr. Stansberry denied discussing any letters with Defendant, and he denied writing "any letters out from the penal farm to Keelan, Keenan, Marcus or Leah." When shown the letter introduced at trial with his name listed in the return address, Mr. Stansberry denied sending the letter or that it was written in his handwriting.

Larry Miller, professor and chairman of the Department of Criminal Justice at East Tennessee State University and "director of the graduate program of forensic document examination," testified "as an expert in forensic document examination." He said that there "was a six-page handwritten letter that was in question, and also . . . some known specimens of [Defendant's] known handwriting."[3] Dr. Miller concluded, "My opinion is the person who wrote the known specimens that I used for comparison also wrote the six-page letter."

Dr. Amy Hawes, Deputy State Medical Examiner with the Tennessee Office of the State Chief Medical Examiner, performed an autopsy on the victim on April 17, 2018. She testified that the victim had a gunshot wound to her chin, and "there were no other significant trauma or injuries." Dr. Hawes opined that the bullet traveled in a path from front to back with "injuries of her mandible which is the bottom jaw bone, the larynx which is the voice box, and the spine. A medium caliber bullet was recovered. Dr. Hawes testified that the victim had a few minor injuries, including a small bruise on her left upper arm, a larger bruise on her right thigh, and a bruise to the right side of her scalp. The bruises on the victim's arm and thigh were yellowish-brown, indicating to Dr. Hawes "that they are older, meaning they were likely already there at the time of her death."

Concerning how quickly the victim may have died, Dr. Hawes testified:

> It would have been [    ], "Fairly quickly," not immediate. And the reason I am somewhat hesitant to say exactly how long is because her larynx which is where your - - your air comes into your lungs, it's part of your airway would come through, that would make it very difficult for her to breathe, and also her spine was injured.
>
> So it's difficult for me to say that it was immediate, but I would expect she would have dead - - been dead within a very short period of time.

Dr. Hawes testified that the trajectory of the bullet in the victim's body went from "front to back" and lodged in her spine. She further testified: "So that tells me that the bullet went directly from front to back. So had her head been turned, that would have also mean[t] that the gun at the time it was fired would have also had to be at the same angle." Dr. Hawes agreed that she could not tell "any positional angle, the way the head swivels or the way, the way her head would have been positioned when she was shot[.]" Dr. Hawes concluded that the victim's "cause of death is a gunshot wound to the head. And the manner of death is homicide."

---

[3] Other witnesses referred to the letter as four pages. Two of the pages had something also written on the back.

- 13 -

Dr. Hawes then testified concerning "soot and gunpowder stippling" in describing the appearance of a wound on the skin. She said, "[A]s a medical examiner all I can say is there's gunpowder stippling there or not, and if it is there, it tells me it was a couple of inches up to a couple of feet." Dr. Hawes noted that the firearms examiner in this case tested the gun to determine the stippling patterns from 3, 6, 12, and 18 inches. In comparing those patterns, Dr. Hawes concluded that "it[']s closest to the test fire pattern of about 12 inches."

On cross-examination, Dr. Hawes agreed that "most suicidal gunshot wounds are at contact range." She disagreed with defense counsel's assertion that "that's what we have here, is contact range." Dr. Hawes testified, "What we have here is intermediate range." She further said, "I have no indication, and there's been no evidence provided to me that would indicate that this wound was self-inflicted."

Defendant testified that he met the victim when he was in the eighth grade, and they dated until March of 2017. Their son, L.M. was born in 2014. Defendant testified that he dated someone named "Kimber" for a short period time after he and the victim split up in 2017, and he had a relationship with Leah Vasquez, beginning in early 2018. He said that the victim had an "on and off" relationship with Nicholas Smith. Defendant testified that during the period of time in early December 2017 until the time of the victim's death, she "emotionally wanted physical attention, but I couldn't do physical attention with her just -- I was in a relationship, so."

Defendant testified that the victim would get upset if she thought he was looking at another woman. He noted that the victim did not like Ms. Vasquez because Ms. Vasquez went to Ihop with Defendant and L.M., and they took a photo that Ms. Vasquez posted on her wallpaper on Facebook. Defendant testified, "And I told her, 'I wouldn't post that.' She said 'Why?' I said, 'Because it may start an issue.'" He said that Ms. Vasquez then began receiving text messages, voice mails, and calls from the victim.

Defendant testified that the victim discussed her relationship with Mr. Smith with him many times. He said that the victim indicated that she was with Mr. Smith for the "financial stability." Defendant testified that the victim called him once about an incident where "she had some type of fight with [Mr. Smith] and he put a gun to her head and wouldn't let her leave on several occasions." He said that L.M. was present at the time. Defendant testified that the victim said that "she thought he was going to blow her head off with a shotgun that he had at his location." He said that the victim sent him text messages that read, "Help, please help, please." Defendant testified that he asked the victim for her location, which she said that she had sent twice, but the location "never came through." He also said that the victim had to call a taxi. Defendant testified that he called 911 for help but the operator said that nothing could be done without knowing the victim's location. He said that the victim later sent him photographs of herself with "strangle marks around

her neck." Defendant said that the victim was fearful of Mr. Smith, and she told Defendant to be fearful of him as well.

Defendant testified that he contacted DCS because he was concerned about L.M.'s safety. He said, "I started to seek custody of [L.M.] because I don't want my son around that bulls[ ]t." Defendant said that he and the victim did not have a visitation schedule for him to see L.M., and he said that she stopped allowing him to see L.M. in December of 2017. Defendant testified, "I put myself on child support before she even found out that I really went to go put myself on child support." Defendant testified that there was an upcoming child support hearing scheduled at the time of the victim's death that Defendant believed "could have been for the custody." He agreed that he was trying to get custody of L.M. Defendant testified that the victim eventually allowed him to see L.M., and he bought the victim the pink Cobra pistol from Mr. O'Neal for her protection. Defendant testified that he bought the gun on March 26 or 27, 2018, and he delivered it to the victim at her mother's house. He admitted that he initially lied about the gun to Detective McFarland because he was "scared," and he was on probation at the time and not supposed to be around any guns.

Defendant testified that on the day of the shooting, he made plans with the victim to see L.M. after work. They agreed that Defendant would go over to the victim's apartment at "probably 8:00 maybe." Defendant testified that when he got to the apartment, the victim was at the door with L.M. standing in front of her. He said that he began "hugging on" L.M., and he gave the victim a hug too. Defendant testified that the victim hugged him back, grabbed his butt, and then walked downstairs. He said that the victim came back upstairs, and everything seemed fine until "she started mentioning relationships and talking about how I'm disrespectful."

Defendant agreed that he took several videos of the interactions between him and the victim that day because "I knew if I were to bring it to court during the child custody so they can see or get a visual of how our relationship was and the condition, circumstances of how [L.M.] was living." Defendant testified that before he started the video, the victim told him that she loved him and wanted to "make it work." She also complained about Defendant being in a serious relationship and began ranting that he needed to "put [his] bitch in check." Defendant said that the victim also began talking about child support and told him that he should "just try to stay in [L.M.'s] life and just be there when she would allow [Defendant] to see him."

When asked if the victim seemed to be under the influence of anything that night, Defendant said that he could not tell and that she did not seem any different than usual and that "[i]t was just natural, it was just natural." He noted that the victim took medicine for anxiety and depression because he had taken her to Cherokee Health System in the past to pick it up. Defendant testified that the victim would sometimes get mad at him and say, "You make me want to kill myself."

- 15 -

Defendant testified that before the shooting, he was sitting on the couch with L.M. and trying to use his Apple Watch to "Facetime" with Ms. Vasquez so that she could see L.M. He said that the victim was standing in front of him by the bathroom door "just going back and forth. Then I really started ignoring her. Then she started talking about 'I don't care you - - they're not going to let you get custody of my son because,' you know, just basically making me - - just trying to make me feel bad, I guess." Defendant testified that the victim was begging him to see L.M. and to pick him up and spend time with him.

Defendant testified that L.M. was sitting on his leg, and they were watching television while L.M. was trying to get his cell phone. Defendant said that he was also texting Ms. Vasquez to let her know that he was getting ready to leave. He asserted that L.M. then said, "Look, Daddy, Mommy has a gun." Defendant testified that the victim was in the kitchen, and he "didn't pay her no mind" at first, but then he heard "like a click noise." He said that he pushed L.M. and told him to "run." Defendant testified that he ran toward the victim and grabbed her arms, pushing her back against the wall. He said, "I guess whenever she hit the wall, the gun came in a weird direction. It was a weird direction that the gun was pointing. It wasn't how you would normally handle a gun, the way that gun was in her hand."

Defendant testified that he tried to hold the victim, but she pushed off the wall, and as they struggled, he pleaded with the victim to drop the gun. He said that the victim kept repeating "You, you, you, you." Defendant testified that L.M. was "pulling his hair because he sees what's going on and then a shot goes off." Defendant testified, "[A]s soon as the shot goes off, I jumped back from her. The gun dropped on the ground from her hand and she like bent down towards the gun like she was about to pick it up." He said that he "kind of kicked the gun a little bit from out of her reach" as he ran toward L.M. Defendant testified that he did not fire the gun or have control of it. He admitted to later taking the gun from the victim's right side to "dismantle it."

Defendant testified that he ran downstairs and called "police" and then checked himself to make sure that he was not injured. He then ran upstairs to see if he could hear anything from the victim. Defendant testified that he could see the victim's feet as he got near the couch and then ran back downstairs "because eventually I you know, just suspected that she was injured." Defendant said that he eventually went to a neighbor's house while still on the phone with the 911 operator because he did not know the victim's address.

On cross-examination, Defendant testified that many of the unknown calls on his cell phone were from the victim because she would "spoof" her cell phone number to call him after he blocked her number. He also claimed that the victim changed her original cell phone number to another one because he gave her original number to DCS. Defendant testified that he and the victim had an extensive text message history. He said that there were incidents between the victim and Mr. Smith that caused him alarm, including an

- 16 -

incident where Mr. Smith placed a gun to the victim's head. Defendant said that because of the incidents with Mr. Smith, the latest being in February of 2018, he purchased a gun for the victim at her request. He agreed that his text messages with the victim consisted of bickering back and forth about L.M. Defendant said that he was concerned that the victim had L.M. around during the incidents with Mr. Smith. He did not know whether there was a text message on his phone about Mr. Smith pointing a gun at the victim's head. Defendant claimed that the victim told him about the gun incident when she called him from one of the unknown numbers. He acknowledged that there were no text messages about him buying the victim a gun.

Defendant agreed that he made several searches on Armslist.com on March 22, 2018, and he deleted the searches because he did not want anything "negative like that" on his phone. Concerning his search history, Defendant testified: "The searches were referencing a TV show, and it had a familiar  - - a legal matter that I had second-hand knowledge of that would expose principles, the structural principles of law, case law that would indicate the possibility of a TV show using fake law." Defendant admitted that he searched firearms, and purchased a gun on March 26 or 27, 2018. He said that he did not have a reason to buy the gun through legitimate means, and he met Mr. O'Neal and purchased it with cash. He claimed that he did not buy any ammunition for the gun. Defendant asserted that his only reason for purchasing the gun was to give it to the victim to "guarantee the safety of [Defendant's] son," even though he claimed that the victim was a "drunk," suffered from anxiety and depression, and schizophrenia and on medication, which she sometimes failed to take. Defendant did not recall if the victim ever got upset with him for buying L.M. toy guns.

Defendant also agreed that he entered a search on his phone for "Killing someone in self-defense while on probation," and he entered the other searches that were deleted. He denied spending a lot of time on the articles that he accessed an hour-and-a-half before the victim was killed. He said, "I glanced at it to look for structural principles of law." Defendant testified that he did not learn anything, and "[t]hat's why there was other searches in my phone that was not offered as my proof, that would state proof that this TV show uses fake law and facts." He claimed that someone manipulated the information on his phone and that the other searches he made contemporaneous with those admitted at trial would have shown that he was looking at a television show, not planning a murder. Defendant testified that he deleted any web history that reflected negatively on him because he never locked his cell phone, and anyone could access it.

Defendant agreed that he had never paid child support for L.M. and that he was set to start paying support on May 23, 2018. He also agreed that he and the victim were in a fight for custody of the child and that the victim had served him with a child support petition. Defendant testified that he asked to "place [himself] on child support" in order to get custody of L.M. Defendant testified that he was served with the child support petition prior to buying the gun. He said that he took the gun to the victim's mother's house on

March 27, 2018, along with some shirts for L.M. He claimed that one of the conditions that the victim gave him for seeing L.M. was the purchase of the gun. Defendant agreed that there was a period of time prior to that when the victim did not allow him to see L.M., including at Christmas and on Father's Day. However, this did not upset him "because [he] knew that [he] was going to get custody of him." Defendant agreed that he lied during the 911 call and to police, when he asked why the victim had a gun, until Detective McFarland confronted him with information that Defendant had purchased the gun from Mr. O'Neal.

Defendant agreed that he was videoing the victim prior to the shooting. He stopped recording at 9:02 p.m., and then placed a call to 911 at 9:06. He claimed that he stopped recording because his cell phone "went dead." He then said that the phone was at three percent before the fourteen-minute 911 call.[4] Defendant testified that the victim initially pointed the gun at him, and he moved out of the way and then ran toward her. He said that he grabbed both of her arms in order to get the gun and pushed her back against the wall. Defendant testified that the gun was in the victim's right hand, and she was "putting her hands back and forth behind her head and over her head trying to stop [him] from getting access to the gun." He said that he continued holding the victim against the wall by her "biceps" and scuffling with her. Defendant testified that at one point, the victim pushed off the wall and pushed him back. He denied that they fell to the ground, even though that is what he told the 911 operator. Defendant testified that he did not let go of the victim until the "gun went off." He said that the victim was "flailing," and using her head to push him on the table when the gun fired. Defendant agreed that even though he and the victim were in a struggle, nothing appeared to be broken or disrupted at the scene, other than a chair "moved away from where the table was at." He said that he kicked the gun away after the victim fell to the floor, and he eventually took the magazine out of it and "placed it away so she would not be comfortable if she was going to get up and grab the gun." Defendant did not recall turning off the kitchen light after the shooting, and he said that he did not remain in the room after the shooting because he was scared to be in there with her. When asked if he did anything to physically help the victim, Defendant replied, "Look, look, I don't have no experience. What am I supposed to do? I don't treat gunshot wounds." Defendant testified that Investigator McFarland later informed him that the victim was deceased, and Defendant became emotional.

Defendant admitted that he wrote the letter recovered at the jail addressed to the four individuals and used Ryan Stansberry's name as the sender. He claimed that he sent the letter to help himself because he was "scared that [his] proof of evidence was not in [his] defense." Defendant agreed that in the letter, he asked the individuals to find a witness to lie to the jury and commit perjury.

---

[4] Defendant testified that he also placed a call to Ms. Vasquez after the 911 call, while his phone was at three percent.

- 18 -

On re-direct examination, Defendant testified that he did not know how the victim died or how the gun fired. He said, "I didn't even know where she was shot." Defendant further testified that he did not know whether the shooting was an accident or if the victim was trying to harm herself.

*Sentencing Hearing*

At the sentencing hearing, the State's proof consisted of the presentence report, an addendum to the presentence report containing Defendant's statement, and the affidavit of complaint from Defendant's prior judicial diversion case. It was noted that Defendant was on judicial diversion at the time of the victim's murder for an aggravated assault against the victim that involved firing a weapon into her car.

Defendant presented no proof at the hearing and gave an allocution during which he said that he still "had love" for the victim and her family. He said that he was not a "bad guy" and got "caught up in a bad situation." Defendant asked the trial court for "some type of relief" and asserted that if the victim's family were there, he "would love to tell them sorry about how that event took place[.]" He said that he wished it never happened and that he, L.M., and the victim's family and friends were hurt by it. Defendant told the trial court that he had taken himself out of the "situation" with the victim and was trying to get custody of L.M. "to get him out of the [same] situation."

After arguments by both the State and Defendant, the trial court revoked Defendant's judicial diversion sentence in the aggravated assault case noting that Defendant "violated the terms of both his judicial diversion and his probation" and ordered him to serve the original three-year sentence.

The trial court found that "none of the mandatory factors" for consecutive sentencing apply in this case. The court further found:

> But we then turn to the permissive consecutive sentencing considerations under 40-35-115(b). I'll note from the outset that I think consideration (6) applies, "The defendant is sentenced for an offense committed while on probation."
>
> I know that he was placed on judicial diversion, so you do have a situation where the judgment was deferred, but if you look at the first sentence of Section 313 it says in - - it's plain language that the sentence should be - - or could be deferred and the defendant placed on probation.

- 19 -

So I think he was in fact statutorily on probation and therefore I think Section 115 (b)(6) does apply to allow the Court to consider permissive consecutive sentencing.

Additionally, the Court is called upon by the State to consider factor 4. "The defendant is a dangerous offender whose behavior indicated little or no regard for human life and had no hesitation about committing the crime in which the risk to human life is high."

I've already ruled on that as it relates to revoking probation in the previous case, but I would like to elaborate on that a little bit now. I think the proof in this case that was presented to the jury absolutely makes this showing.

This was a cold, calculated first-degree murder. And the steps that [Defendant] took to procure the weapon, and just think of the little details here, to procure - - it was a pink gun. So it would look like a gun that would be possessed by a woman.

And then to eventually use that gun in her murder. To have the child present when that happens. The Court does not think that was an accident. I think that was an attempt by [Defendant] to create a diversion, to create the thought in the investigators, Well, who would shoot someone in front of their own child?

I think that was something that was done intentionally. I think conducting that act in front of the child not only led to [the victim's] death, but then you're firing a weapon in a closed room like that, it could have very easily led to the death of the child.

He had no hesitation about committing this crime. It took - - it was sometime between the time the gun was purchased and the actual murder took place. I think it was part of his grand design that whole time to commit this murder. He would have had multiple opportunities to pull back and to change his mind and to not commit this crime, but he did.

I do think an extended sentence is necessary to protect the public against further criminal conduct by the defendant. I understand [defense counsel's] argument that really as a criminal matter he's only had issues with this one victim. But I think it's true what the State says as well, this was a victim who presented an issue for him. She was a problem to him.

- 20 -

There will be instances in his life, if he does survive this sentence, where he will run into other individuals like that. And I do find reading the report or the statement given by [Defendant] which has been filed as Exhibit 2, as well as his allocution here to the Court today, if you read it closely and if you listen closely to what it's saying, I really think it's chilling.

The lack of remorse, the air of he was doing this victim a favor, bless her mother's heart. She's struggled with things. Bless this victim's heart; I was just trying to help her. And just a complete lack of contrition and remorse for taking this woman out of the world. It is chilling. And I think it speaks to how [Defendant] could handle further disputes later in life.

Does an aggregate sentence reasonably relate to the severity of the offenses committed? I think tacking three years on to a life sentence, you know, and effective parole eligibility of 51 years, I think it does. I think when you commit two actions like this, they're separate, horrible, violent acts and they should be punished separately.

The trial court imposed the mandatory life sentence for Defendant's first-degree murder conviction to be served consecutively to his three-year sentence for aggravated assault in the previous case.

## ANALYSIS

### I.    Sufficiency of the Evidence

Defendant argues that "[t]here is insufficient evidence in the record to establish beyond a reasonable doubt that the [d]efendant is guilty of first-degree murder." The State responds that the evidence presented at trial was sufficient to support the jury's verdict.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson*

*v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

First-degree murder is defined as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id*. § 39-11-302(a).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id*. § 39-13-202(e).

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. *Bland*, 958 S.W.2d at 660. Our supreme court

has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the declaration of the intent to kill, the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, the infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, the destruction or secretion of evidence, and calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. *See State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004) (citing *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998)).

We conclude that the evidence viewed in the light most favorable to the State proves that the killing in this case was premeditated. The victim and Defendant were involved in a dispute over child support and custody of their four-year-old son, L.M., at the time of the shooting. The proof shows that Defendant purchased a pink Cobra .380 caliber pistol in cash a few weeks before the victim's death from Mr. O'Neal, and the gun was not registered in Defendant's name. After the shooting, Defendant told the 911 operator and investigators that he did know the victim had a gun, and he asked multiple times why she had a gun. It was not until Investigator McFarland confronted Defendant with information that Defendant purchased the weapon from Mr. O'Neal that Defendant changed his story and said that he bought the gun for the victim, at her request, for protection from the victim's current boyfriend, Mr. Smith, and had given it to her on March 27, 2018.

Defendant told several different versions as to how the shooting occurred. He told the 911 operator that the victim appeared holding the pistol, and the weapon discharged when he wrestled her to the ground. He further told the operator that "she pulled the trigger. It was pointing right at her." Defendant told Detective McFarland that he pushed the victim against the wall and that the gun discharged as she pushed him back. Finally, at trial, Defendant testified that he and the victim struggled in the kitchen and that he was holding her arms as she pushed off the wall against him. He claimed that both of them were on their feet when the gun discharged and fell to the floor. However, the jury rejected Defendant's explanation at trial , as it was inconsistent with the physical evidence. The medical examiner testified that based on tests performed by Special Agent Broadhag, the muzzle of the pistol was approximately twelve inches from the victim's face when the gun discharged. The path of the bullet went from front to back with "injuries of [the victim's] mandible which is the bottom jawbone, the larynx which is the voice box, and the spine," where the bullet lodged. "[T]he bullet went directly from front to back." The medical proof was not consistent with any of Defendant's explanations as to how the shooting occurred.

At no point did Defendant attempt to render aid to the victim other than to call 911 at some point and say that the victim was being aggressive and that he thought she was going to shoot him. The body camera footage shows that the kitchen light was turned off when officers arrived at the apartment. Defendant told the 911 operator that the victim shot herself, and he repeatedly lied about the gun during the call. Defendant claimed that he did not know the address of the victim's apartment and had to go to a neighbor's house to get the address, even though he had just driven himself there. There was also evidence presented that shortly before the shooting, Defendant searched the internet on his phone for information on "limits on self-defense" and "killing someone in self[-]defense while on probation." Defendant told Detective McFarland that he was on probation at the time of the shooting. He also wrote a letter to several individuals after his arrest in this case asking them to find a witness to falsely testify on his behalf at trial and to edit the internet search history on his phone.

Defendant contends that the evidence at trial "is entirely consistent with [his] explanation of how this shooting occurred." He correctly points out that no gunshot residue was found on his hands, that his DNA was not found on the gun or under the victim's fingernails, that no latent fingerprints were found on the gun, and there was no blood spatter on his clothing. However, the jury heard this evidence, and as was its prerogative, found that it did not prove Defendant's innocence.

We conclude that a rational jury could have determined beyond a reasonable doubt that Defendant killed the victim intentionally and with premeditation. Therefore, the evidence is sufficient to support Defendant's first-degree murder conviction, and he is not entitled to relief on this issue.

## II.     Admission of L.M.'s Statements to the Forensic Interviewer

Defendant argues that the trial court "failed to consider the applicability of *Chambers v. Mississippi*, [410 U.S. 284 (1983),]" in determining whether L.M.'s statement during his forensic interview was admissible and that he could have "admitted this exculpatory interview into evidence, and it is highly likely that this exculpatory interview would have changed the outcome of this trial." The State contends that the issue as to *Chambers* is waived because Defendant has raised it for the first time on appeal and that the trial court properly determined that L.M.'s statement was hearsay, and no exception to the hearsay rule applied to allow its admission. The State further argues that the statement was not admissible under *Chambers*.

Before presentation of the evidence at trial, the State made an oral motion in *limine* "to exclude any reference to statements made of [L.M.], the child in this matter, to Childhelp and specifically forensic examiner Kelly Sanders." The State argued that any statements made by L.M. during the interview would be hearsay with no applicable

exception. Defense counsel asserted that the statement would be "an excited utterance, given the nature of the situation," referring to a recording from Deputy Bryant's patrol car video. The trial court pointed out that the parties were referring to two different statements made by L.M. and noted that the body cam footage was already "in evidence with the limitations that was set forth yesterday." Concerning the forensic interview, the State informed the trial court that L.M.'s statement was given to the forensic interviewer on April 17, 2018, the day after the shooting and pointed out that the interview notes stated that "[t]he child was not very verbal and the extent of what he said could be reduced . . . [t]o 'Mama is dead and mama had a pink gun.'"

The trial court did not rule on the motion in limine and stated:

> Okay. Well, as it relates to Childhelp interview, I mean on its face I think we're certainly talking about hearsay here. The defense is claiming the exception applies because its an excited utterance. I haven't seen the tape, so I don't have any way of knowing whether it is or is not an excited utterance. So I'm unable to rule on that particular point at this time. So I would ask that neither party mention it going forward until we have an opportunity for me to look at the tape and see what, if any, hearsay exceptions might apply to the Childhelp interview. So I guess I'll reserve ruling on the State's motion as it relates to that.

At trial, Defendant abandoned the excited utterance argument and in his brief on appeal concedes that the exception would not apply in this case to the statement L.M. made in the forensic interview. He did not make any further attempt to introduce L.M.'s statement at trial. Defendant does not argue that any other hearsay exception applies here.

On appeal, Defendant argues for the first time that L.M.'s statement to the forensic interviewer should have been considered by the trial court in accordance with ruling of the United States Supreme Court in *Chambers*. However, issues raised for the first time on appeal are waived. *See* Tenn. R. App. P. 36 (a); *State v. Herbison*, 539 S.W.3d 149, 164 (Tenn. 2018) ("[t]o preserve the double jeopardy issue, [the defendant] had to raise it in his motion for new trial and appellate brief").

Defendant argues that "failure by the trial court to consider the applicability of *Chambers v. Mississippi*, as well as the trial court's insistence that a traditional hearsay exception must apply in order for it to consider admitting the forensic interview into evidence, constitutes plain error that has affected the substantial rights of [Defendant]." To demonstrate plain error, Defendant must show that: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was violated; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to achieve substantial

justice. *State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021), *reh'g denied* (May 21, 2021), *cert. denied*, 142 S. Ct. 790 (2022) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016). "[A]n appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020).

Defendant did not include the Childhelp interview in the record at trial or on appeal and failed to provide an offer of proof at trial from the forensic interviewer. Additionally, at trial, Defendant failed to show that L.M.'s statement to the forensic interviewer had sufficient indicia of reliability. After the trial court indicated that it would have to review the interview and reserved ruling on the matter, Defendant failed to pursue the issue further. He made no argument at trial that the statement was admissible in accordance with *Chambers*. Because we do not have a sufficient record from which we can analyze this issue and cannot conclude that "a clear and unequivocal rule of law" was breached in this case, we cannot review this issue under the plain error doctrine. *Rimmer*, 623 S.W.3d at 255-56. Defendant is not entitled to relief on this issue.

## III. Admission of Evidence From Google Searches[5]

Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403.

It is well-established "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod,* 937 S.W.2d 867, 871 (Tenn. 1996). Tennessee Rule of Evidence 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b) Advisory Comm'n Cmts.; *see State v. Parton,* 694 S.W.2d 299, 303 (Tenn. 1985); *State v. Hooten,* 735 S.W.2d 823, 824 (Tenn.Crim.App. 1987). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crimes, wrongs, or acts to be clear and convincing; and (4) the court must exclude

---

[5] We have combined Defendant's Issues III and IV.

the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

## A. Failure to Redact Google Searches

First, Defendant contends that "[t]he trial court erred by failing to redact the words 'on probation' from the Google searches that were taken from the [d]efendant's phone by law enforcement and introduced into evidence at trial." The State responds that the issue is waived because Defendant failed to prepare a proper record for review.

The record shows that Defendant filed a pretrial motion in limine to preclude the State from making reference to Defendant's prior criminal history. Defendant specifically sought to exclude "any reference to [his] searches on his phone regarding committing a crime while on probation." A hearing on the motion was held, and the trial court took the matter under advisement. In his brief, Defendant cites to his motion in limine and court minutes in the record showing that a hearing was held. However, the record does not include a transcript of the hearing nor does it include any order, written or oral, concerning the motion. Defendant also makes no reference in his brief to the hearing. Further, Defendant did not respond to the State's waiver argument in a reply brief, or request to supplement the record with the missing transcript. When a party seeks appellate review, there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal. *State v. Ballard,* 855 S.W.2d 557, 560 (Tenn. 1993) (citing *State v. Bunch,* 646 S.W.2d 158, 160 (Tenn. 1983)). Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue. *Id.* at 561 (citing *State v. Roberts,* 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988)). Absent the necessary relevant material in the record, an appellate court cannot consider the merits of an issue. *See* T.R.A.P. 24(b). Here, Defendant failed to include the transcript of the hearing on his motion in limine. Accordingly, we conclude that the issue has been waived and decline to address its merits.

## B. Results of Google Search by Detective McFarland

Defendant argues that the trial court erred by admitting results of a Google search conducted by Detective McFarland a week after the victim's murder, as well as the contents of the top three articles from the Google search.

During Detective McFarland's testimony, the State moved to admit Exhibits 60 through 74, all related to Defendant's cell phone contents and history. Defendant objected only to Exhibit 74, the Google search conducted by Detective McFarland. Defendant did

not object to Exhibit 73 which was the report of cookie data from Defendant's cell phone. In a jury-out hearing, the following exchange took place:

> [Prosecutor]: Okay. So if you look at 71, Judge, you see in Exhibit 71 that is an exhibit that's been introduced as the search history on the defendant's phone, and those are items that he searched, some of which have been deleted. As you can note from the report, it doesn't tell us when the actual item was searched, and so we are relying upon other means for the investigator to testify about that.
>
> So in conjunction with the web history report and the cookies report, what the investigator did was he went in those and at Google, to Google, and googled, "Killing someone in self-defense while on probation." And that was what Exhibit 74 started with. It was a Google search that he did April 23rd, 2018. And the top three results, Judge, are the top - - when he googled that April 23rd of 2018. Now, this is the link that links this search, "Killing someone in self-defense while on probation."
>
> This is why we know he did it in April of 2018 is because the top three Google results he actually visited those websites. The number one Google result it comes back to one of the three articles that we had attached to the Google search and that was "Convicted felon faces charges for defending self against violent home invasion."
>
> And we know that that is on his phone because it appears in the cookies report. It's going to be 66 through 68. The website being Learnaboutguns.com, "Convicted felon." Cookies 66 through 68. So that, that comes back as the number one Google search and is also in his cookies for that - - and that date and time. The cookies were – put it there on April 16th around 7:30.
>
> The second article, Judge, is a direct hyperlink from the web history. You see in the web history number five has a hyperlink to the article that was accessed on April 16th, 2018, and it's also found in his cookies, 75 through 82, and 86 through 92.
>
> So it's the number two return when you google the term, "Killing someone in self-defense while on probation," and he accessed it because its in his web history and his cookies.
>
>     \*     \*     \*

[Prosecutor]:     All from April 16th.  The number three items that came up in the Google search is number six in his web history, and it actually is a hyperlink to the website TexasCLH - - CHLforum.

\*     \*     \*

[Prosecutor]:     And it's also appearing 93, 95 in his cookies.  The remaining items in the Google search that we attempted to get in, we don't have any evidence on his phone that he ever hyperlinked through to them or even accessed them because there's no cookies or web history relating to all the rest of the - - we have four pages of Google search, Judge.

\*     \*     \*

[Prosecutor]:     But we believe that this search that the detective conducted back in April of 2018 is the link and shows the positive connection between the search of "Killing someone in self-defense while on probation," to prove that that was done April 16th, 2018.

So that was the gravamen and the connection between the web history, the cookies, and the deleted phrase, "Killing someone in self-defense while on probation."

When the Court learned that Exhibit 74 contained links to additional websites which were not verified to have been accessed by Defendant, it sustained the objection to Exhibit 74, stating:   "If there are - - if we have cookies or web history that indicates specific sites that he actually visited, I think that would be admissible.  But I think we need to tie it into that and we can't just have all of these links that he may or may not have even seen."  The State then agreed to redact the report contained in Exhibit 74 to include only the first three articles that were verified to have been accessed by Defendant's cell phone through the cookie report admitted without objection as Exhibit 73.

When the trial resumed, Detective McFarland testified that on April 23, 2018, he replicated the Google search Defendant made on his phone for "killing someone in self-defense while on probation."   The top three results included an article from Learnaboutguns.com, entitled "Convicted Felon Faces Charges for Defending Self Against Violent Home Invader"; an article from Lawyers.com, entitled "Limits on Self-Defense"; and an article from Texasschlforum.com, entitled "Probation, stand your ground, peaceful journey . . .etc."  Detective McFarland testified that the "cookies" report from Defendant's phone indicated that the articles were accessed on Defendant's phone.  The trial court then admitted the redacted version of the report as Exhibit 74 over Defendant's renewed objection.  The trial court concluded:

- 29 -

I mean as to the fact that the detective singled out certain search items, I mean obviously this is a homicide investigation so he's going to zero in on certain items, you know, "Reap what you sow," whatever that means.

Apparently it didn't have any significance to the investigator, so he didn't look into that. We certainly don't expect him to pull out every single website that the defendant mentioned, but rather focus on the ones that might have some relevance to the issue at hand here.

What we do have is a search - - a couple of search terms that the investigator replicated about a week after the incident. The State had redacted the search results to list only the three links that the investigator was able to tie back to the defendant's phone as websites that had been visited.

Whether they were in the web history or whether they were in the cookies portion of the telephone, you know, any argument as to, you know, whether the defendant actually read them or how much time he spent reading them. I think that's an argument that would go towards the weight that the jury should attach to those, but not necessarily to their admissibility.

So I am comfortable with the redactions that have been made by the State that we are limiting this to only the websites that were actually accessed on that phone, and I think that that would be admissible.

Defendant argues in his brief that the Google search and accompanying articles are not relevant evidence within the meaning of Tenn. R. Evid. 401 as the search was conducted a week after the shooting occurred. Defendant also argues that "it is well known that Google [s]earch results are not static; they can change from day to day." Thus, there is no way to know whether the Google search conducted by Detective McFarland using search terms previously used by Defendant would yield the same results, and therefore Detective McFarland's Google search results are irrelevant and inadmissible. Defendant further argues that even if the search results were relevant, the probative value was substantially outweighed by the risk of prejudice since the search made reference to "probation" and may have implied to the jury the Defendant was on probation or may have been a convicted felon. The State argues that the search results were not speculative because the evidence presented at trial established that the articles in question were actually accessed on Defendant's phone based on the cookies data, and further that the evidence was relevant to show that Defendant acted with premeditation.

We conclude that the redacted report with the results of the search replicated by Detective McFarland were relevant to the issue of whether Defendant killed the victim with premeditation. Through the cookie data admitted without objection in Exhibit 73, the proof showed that the top three articles that came up as a result of the search were actually accessed on Defendant's phone prior to the victim's death. Other articles that came up as a result of the search were redacted. The trial court determined that Defendant's exposure to the information in the search results went to the weight of the evidence rather than its admissibility. Because Defendant did not object to Exhibit 73, the cookie data report which verified Defendant's access to the articles on his cell phone, there can be no prejudice. Defendant is not entitled to relief on this issue.

## IV.    Consecutive Sentencing

Defendant argues that the trial court erred by ordering his life sentence for first-degree murder to be served consecutively to his prior three-year sentence for aggravated assault. The State responds that the trial court properly sentenced Defendant.

When an accused challenges the length of a sentence, this court reviews the trial court's sentencing determinations under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "This abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). *See also State v. Pollard*, 432 S.W.3d 851, 859-60 (Tenn. 2013) (standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness). A finding of abuse of discretion indicates the "trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001). A trial court has not abused its discretion unless "the record [is] void of any substantial evidence that would support the trial court's decision." *Id*.

In making sentencing decisions, trial courts must consider the following: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the conduct involved; (5) evidence and information offered by the parties regarding the statutory mitigation and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant wishes to make on his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b).

Tennessee Code Annotated section 40-35-115(b) sets forth the criteria the court shall consider in ordering sentences to run consecutively or concurrently:

> (b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;
>
> (6) The defendant is sentenced for an offense committed while on probation;

*Id*. § 40-35-115(b)(4). *See also Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976). A defendant may be classified as a dangerous offender if the crimes for which he is convicted indicate that he has little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. *Id. See also* T.C.A. § 40-35-115(b)(4). The decision to impose consecutive sentences when crimes inherently dangerous are involved should be based upon the presence of aggravating circumstances and not merely on the fact that two or more dangerous crimes were committed. *Gray*, 538 S.W.2d at 393. To impose consecutive sentencing based on a finding that the defendant is a dangerous offender, the court must also find that "an extended sentence is necessary to protect against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). The trial court must also make specific findings about "particular facts" that support the *Wilkerson* factors. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999) (citing *Wilkerson*, 905 S.W.2d at 939). So long as the trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal. *Pollard*, 432 S.W.3d at 862.

As set out above, the trial court articulated its reasons for consecutive sentencing and sentenced Defendant to a within-range sentence that reflect the purposes and principles of the Sentencing Act. Defendant contends that the trial court erred in finding that he was sentenced for an offense committed while he was on probation because judicial diversion "is not the same as probation" for purposes of consecutive sentencing. Defendant cites no authority in support of his claim. Tennessee Code Annotated section 40-35-313(a)(1)(A) states, "The court may defer further proceedings against a qualified defendant and place the defendant on probation upon such reasonable conditions as it may require without entering a judgment of guilty and with the consent of the qualified defendant." The plain language of the diversion statute states that a defendant on diversion is on probation. We

agree with the trial court that Defendant committed the murder in this case while he was on probation for aggravated assault.

Likewise, the trial court did not abuse its discretion by finding that Defendant was a dangerous offender whose actions indicated little to no regard for human life and that he expressed no hesitation about committing a crime in which the risk to human life was high. The trial court made the requisite *Wilkerson* findings, and concluded that the circumstances of the offense were aggravated, that confinement for an extended period of time was necessary to protect society from further criminal activity from Defendant, and that the aggregate sentence reasonably related to the seriousness of the offenses. The trial court properly ordered Defendant to serve his life sentence consecutively to his prior three-year sentence for aggravated assault. Defendant is not entitled to relief on this issue.

## V.    Cumulative Error

Defendant contends that he is entitled to a new trial because "cumulative error exits such that [he] was denied due process of law and a new trial is necessary." The State counters that Defendant is not entitled to relief due to cumulative error.

Our supreme court has stated:

> The United States Constitution protects a criminal defendant's right to a fair trial; it does not guarantee him or her a perfect trial. We have reached the same conclusion with regard to the Constitution of Tennessee. It is the protection of the right to a fair trial that drives the existence of and application of the cumulative error doctrine in the context of criminal proceedings. However, circumstances warranting the application of the cumulative error doctrine to reverse a conviction or sentence remain rare.
>
> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (citations omitted).

To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings. *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015) (citing *Hester*, 324 S.W.3d at 77). After considering each of

Defendant's issues on appeal and finding no error, we need not consider the cumulative effect of any alleged errors.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JILL BARTEE AYERS, JUDGE